L–O DISTRIBUTORS, INC., a
Minnesota Corporation,
Plaintiff,

v.

SPEED QUEEN COMPANY, a
Delaware Corporation,
Defendant.

Civ. No. 4–84–1207.

United States District Court,
D. Minnesota,
Fourth Division.

July 5, 1985.

Marianne D. Short, Michael A. Lindsay, Dorsey & Whitney, Minneapolis, Minn., for plaintiff.

Stephen J. Holtman, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, Iowa, and Michael Stern, Fredrikson & Byron, Minneapolis, Minn., for defendant.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on plaintiff's motion for a preliminary and permanent injunction restraining the defendant from terminating plaintiff's distributorship agreement with defendant, under the Wisconsin Fair Dealership Law, Wis.Stat. § 135.01 *et seq.* The Court held a trial on plaintiff's motion from March 25 to March 28, 1985. Plaintiff's motion will be denied.[1]

## FINDINGS OF FACT

Defendant Speed Queen Company (Speed Queen), a Delaware corporation, is a manufacturer of laundry products with its principal place of business in Ripon, Wisconsin. Speed Queen manufactures both home laundry products and commercial laundry products. Speed Queen distributes its home laundry products through both independent distributors and company-owned branches. Speed Queen has approximately 50 independent distributors and six branches.

Plaintiff L–O Distributors, Inc. (L–O) is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. L–O was formed in 1975 to act as a wholesale distributor of appliances and electronic goods. During L–O's first full year of operation, it had gross sales of approximately $5,000,000. L–O's gross sales were approximately $10,000,000 for its fiscal year ending in 1982 and $12,000,000 for its fiscal year ending March 31, 1984. L–O's sales of Speed Queen products were slightly less than $1,000,000 for the fiscal year ending March 31, 1984. Sales of Speed Queen products therefore represent approximately 8 percent of L–O's total sales. L–O also distributes the Sylvania, Gibson, Panasonic, and Tappan brands of appliances.

During the period from 1970 until 1975, Speed Queen did not utilize independent wholesale distributors in order to market its home and commercial laundry products, but rather engaged in direct sales of these products to retailers across the country. While Speed Queen still sells its products directly in a few specified geographical areas, its primary method of product distribution since 1975 has been through independent distributors. From 1975 until late 1977 or early 1978, Speed Queen distributed its products in Minnesota and western Wisconsin (the "Minnesota territory") through the Roth distributing firm. Speed Queen changed distributors in 1978, and utilized Dockendorf Co. as its distributor until 1980. When the owner of Dockendorf Co. died in 1980, Speed Queen distributed its laundry products through Roth once again. This relationship continued until the summer of 1982, at which time Speed Queen began looking for a new distributor because it was dissatisfied with its market share. An additional reason for the change in distributors was that Roth carried the Amana line of laundry products, which are manufactured by Speed Queen's parent, Raytheon Corporation. Since the marketing strategy for the Amana line differs greatly from the strategy for the Speed Queen line, Raytheon decided to distribute each line through a separate distributor.

Representatives from Speed Queen met with L–O personnel in June and July of 1982. L–O had learned that Speed Queen was searching for a new distributor and had solicited Speed Queen for the opportunity to serve as its distributor. During these meetings, William Cross, the president and chief executive officer of L–O, advised the Speed Queen representatives that L–O would increase the sales of Speed Queen laundry products. While Jeffrey Brothers, Speed Queen's national sales

---

1. This memorandum incorporates the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52.

manager for home laundry sales, testified that no specific sales or market goals were discussed at the initial meeting between the parties, it is clear that both sides understood that it was important for L–O to increase Speed Queen's market share in the home laundry area. Cross testified that he was aware of Speed Queen's marketing strategy at the time of the initial discussions between Speed Queen and L–O, and that he had advised Speed Queen that he would implement this strategy. Market share growth is an important element of this strategy, since Speed Queen is a relatively small manufacturer which has invested millions of dollars in new product development. Cross testified that he told Speed Queen that L–O would increase its market share in the Minnesota territory.

The laundry products sold by Speed Queen are known as "push" products; demand for these items is generated through point-of-sale "advertising," information, and service. In the trade, "push" products are distinguished from "pull" products. "Pull" products are those which have a high degree of consumer awareness, and for which demand is generated through broad-based consumer advertising. L–O represented to Speed Queen that it was experienced in marketing "push" products and that it was therefore well-qualified to be a distributor.

During the meetings in June and July of 1982, Speed Queen represented to L–O that it would assume a dealer base from Roth, that Speed Queen would provide advance promotional money to defray the cost of "seeding," or establishing the Speed Queen line, that Roth would continue as a distributor in the same territory and market the Amana laundry line, and that Speed Queen would provide necessary sales and marketing assistance.

L–O and Speed Queen executed a distributorship agreement on August 20, 1982, and L–O officially became a distributor of Speed Queen products on September 1, 1982. The parties' contract was replaced by a new agreement on January 1, 1983. Pursuant to this contract, Speed Queen agreed, among other things, to assist L–O in the promotion and sale of products to dealers and consumers. Article C 3. L–O agreed, among other things, to devote its best efforts to promote sales of Speed Queen products. Article D 2. The agreement further provides that it may be terminated "by either party at any time for any reason upon giving ten (10) days notice of same by certified mail to the other party, which termination shall be effective ten (10) days from the date of mailing said notice." Article L 1. The agreement also provides that it shall be deemed to have been entered into in Wisconsin and that it "shall be construed, enforced and performed in accordance with the laws of the State of Wisconsin." Article Q. L–O's territory for the distribution of Speed Queen products under the agreement consists of 58 counties in Minnesota (including the Twin Cities metropolitan area) and 24 counties in western Wisconsin. The distributorship agreement specifically provides that L–O's right to distribute Speed Queen products in this territory is nonexclusive. Article A.

Speed Queen measures the performance of its distributors in primarily two ways. First, it calculates the market share achieved by each of its distributors on a monthly basis. The market share figure represents the number of units sold by a distributor as a percentage of the total number of units sold in the distributor's territory by the entire industry. Second, Speed Queen assigns monthly sales quotas to each distributor and then calculates percentages for sales in relation to these quotas. Speed Queen uses the quotas primarily to determine the amount of merchandising and promotional money that it provides to its distributors. L–O did not perform well by either of these indicia during its tenure as a Speed Queen distributor.

At the time that Speed Queen appointed L–O as its distributor, in September of 1982, the market share for Speed Queen products in L–O's distribution territory was 2.8 percent. By the end of 1982, the market share had dropped to 2.5 percent (year to date). In 1983, the monthly market share slipped even further; at the end of the year it stood at 2.3 percent. During

1983, the monthly market share figure dropped as low as 1.1 percent, and the year to date market share figure was at no time equal to or greater than 2.8 percent, the share of the market that Speed Queen had just prior to L–O's appointment as a distributor. L–O's performance did not improve in 1984. In December of 1984, L–O's year to date market share stood at 2.3 percent. Again, at no time during 1984 was the year to date figure equal to or greater than the market share which Speed Queen had established prior to L–O's arrival as a distributor. L–O had the lowest market share of the eleven distributors in the Midwest region at the end of 1984. Moreover, eight out of the other ten distributors in the region were able to increase their market share from the end of 1983 to the end of 1984.

The second criterion which Speed Queen uses to measure distributor performance is sales in relation to quota. During 1983, L–O sold 86.3 percent of its quota, placing it 46th out of 58 Speed Queen distributors. By September of 1984, when Speed Queen made the decision to replace L–O with a new distributor, L–O's year to date percentage of sales to quota had slipped to 79 percent; this figure placed it 50th out of 55 distributors. While L–O's total sales did increase slightly during the last few months of 1984, it still ranked 43rd out of 53 dealers at the end of the year, with a figure of 83.9 percent.

L–O's witnesses offered two explanations for L–O's poor performance as a Speed Queen distributor. Neither is particularly persuasive in light of all the evidence. First, the witnesses contended that L–O's failures can be attributed to the fact that it was a relatively new distributor. L–O represented to Speed Queen at the outset, however, that it possessed consider-

able experience with "push" lines, and that it would be able to increase Speed Queen's market share. More importantly, a number of other distributors in Speed Queen's midwest region had been distributors for a comparatively short period of time, and nonetheless had managed to increase their market share.

L–O's witnesses' second contention was that L–O's poor performance is traceable to the lack of support which it received from Speed Queen. Speed Queen was contractually obligated to provide its distributors with sales and marketing assistance. The distributor generally receives this assistance through one of Speed Queen's regional sales managers. L–O did not receive continuous assistance from Speed Queen regional managers during its tenure as a distributor.[2] The fact that there were periods during which L–O did not have a regional manager assigned to it, however, does not suffice as an excuse for its poor performance. L–O received excellent assistance from regional sales manager Bruce Coombs during the first six months of 1984. Moreover, during the periods when L–O was without a regional manager, western zone manager Timothy Garbet and national sales manager Jeffrey Brothers both made themselves available for assistance. Finally, while L–O was relatively new to Speed Queen, it was an experienced distributor of laundry products. L–O cannot, therefore, blame its poor performance as a distributor on Speed Queen's admittedly less than perfect assistance.

Speed Queen management began to express concern about L–O's performance in early 1984. Garbet met with representatives from L–O in February of 1984 and advised them that the July, 1983 to December, 1983 market share figures indicated that L–O's performance was flat and that a

---

**2.** From September, 1982 until June, 1983, Howard Sund served as the regional manager for L–O's territory. There was general agreement among the witnesses that Sund was not an effective regional manager. From June, 1983 until December, 1983, L–O did not have a regional manager, although Speed Queen western zone manager Timothy Garbet offered his assistance on several occasions. From December, 1983 until June, 1984, Bruce Coombs served as the

regional manager for L–O's territory. Coombs spent a considerable amount of time working with L–O, and L–O's witnesses agreed that he was an excellent regional manager. After Coombs left in June of 1984, L–O did not receive representation from Speed Queen until September, 1984, when Jesse Bridges became regional manager. Bridges served in that position for the remainder of the time that L–O was a Speed Queen distributor.

problem was developing. A number of more specific problems were discussed at this meeting. Garbet advised L–O of the need to generate sales in northern Minnesota; there was considerable testimony at trial regarding L–O's lack of success at selling more than a nominal number of Speed Queen units in this area. Second, Garbet expressed the concern that the commission structure which L–O's sales representatives operated under created a disincentive to make large sales. Finally, Garbet specifically requested Wayne Meitrodt, L–O's Speed Queen sales manager, to prepare a target account program and submit it to him in writing by March 5, 1984. This target account program, according to Garbet, was to have been an examination of the market on a county by county basis, with particular reference to accounts which had not yet been signed and to retailers showing poor performance. The program was also supposed to include a timetable for making presentations to these accounts and assessing retailer performance.

L–O did not submit the target account program to Speed Queen until April 24, 1984, almost two months after the March 5 deadline which it had been given by Garbet. While Garbet did not testify with any specificity regarding the content of this proposed program, he did indicate that he was displeased because it was simply a list of dealers rather than a comprehensive plan. Both Garbet and Coombs met with representatives from L–O at the end of April, 1984. Garbet expressed his concern about the delay in submitting the target account program, and warned L–O that there would be a change in distributors if L–O's performance did not improve. Coombs testified that he advised the representatives from L–O that Speed Queen expected immediate results in market share percentage and the number of signed dealer agreements. Coombs further testified that he indicated at this meeting that other distributors would be considered unless L–O's performance improved.

In September of 1984, Speed Queen concluded that L–O's performance as a distributor was unacceptable, primarily because of the decline in market share in its territory; Speed Queen felt that L–O was inhibiting sales growth. At some point in the fall of 1984, Brothers recommended to the vice president of home laundry sales that L–O be terminated as a distributor. Brothers based this recommendation upon an analysis of L–O's performance which he had begun in June or July of 1984. This analysis included a review of market share reports, the list of "void" counties in L–O's territory (those counties without a Speed Queen dealer), and feedback from the Speed Queen field sales force. Brothers testified that his analysis revealed that L–O's market share had decreased, that the number of void counties in L–O's territory had remained the same, and that the reports from the sales force indicated that Speed Queen was not important to L–O.

Speed Queen's policy is to refrain from terminating a distributorship for poor performance unless and until it has arranged for another distributor to take over the territory immediately.[3] It is also clearly Speed Queen's policy, however, to terminate distributorships which are not successful at increasing the market share in their territory, meeting their quota, or otherwise implementing Speed Queen's market strategy. Over the past two years, Speed Queen has terminated at least six distributorships for reasons essentially similar to the reasons for L–O's termination. Brothers testified that in the summer of 1984, Speed Queen received phone calls from a number of wholesale distributors expressing interest in Speed Queen's Minnesota territory. Among the distributors that expressed interest in the Minnesota territory was Merco-Milwaukee. Merco-Milwaukee had been Speed Queen's distributor in Milwaukee and eastern Wisconsin since 1977. The evidence at trial indicated that Merco-Milwaukee consistently ranks in the top ten Speed Queen distributors in terms of sales to

**3.** Speed Queen's Vermont distributor experienced a significant decrease in market share during the period from 1981 to 1984. This distributorship was not terminated for poor performance, however, because there were no other distributors available to take over the territory.

quota ratio. Moreover, during 1983 and 1984, Merco-Milwaukee had the highest market share of any distributor in Speed Queen's midwest division, and it had managed to increase its market share over time. There was general agreement among the witnesses from Speed Queen that Merco-Milwaukee was one of its top distributors. Speed Queen entered into serious negotiations with Merco-Milwaukee sometime in the fall of 1984 regarding a distributorship agreement for L–O's Minnesota territory. In early November, 1984, Merco-Milwaukee agreed to establish Merco -Minnesota,[4] which would function as a second Speed Queen distributor in L–O's Minnesota territory. Speed Queen and Merco also agreed that Merco-Milwaukee would function as a second Speed Queen distributor in the western Wisconsin portion of L–O's territory. Both divisions of Merco signed a distributorship agreement with Speed Queen on December 15, 1984.

At approximately the same time that it was negotiating with Merco, Speed Queen took steps to terminate its distributor relationship with L–O. On November 12, 1984, Speed Queen sent L–O a certified letter giving 10 days notice of termination pursuant to Article L 1 of the parties' contract. Speed Queen stated in its notice of termination that it had "decided that we can improve our position in this market by making a change in distribution." L–O responded to this notice by filing the present lawsuit on November 20, 1984 and by moving for a temporary restraining order. L–O sought an order temporarily restraining Speed Queen from terminating L–O, in accordance with the provisions of the Wisconsin Fair Dealership Law (WFDL). On November 21, 1984, Speed Queen sent another letter to L–O which withdrew the notice of termination and stated that Speed Queen viewed the distributorship agreement as being in full force and effect.

On November 28, 1984, Speed Queen sent L–O a new letter of termination. This second notice of termination attempted to split L–O's territory by state line and provided 10 days notice of termination for the Minnesota counties, as provided for in the distributorship agreement, and 90 days notice of termination for the Wisconsin counties, as required by the WFDL, Wis. Stat. § 135.04. The reason given for termination in the second notice of termination was L–O's "steady decline in market share since [its] appointment."

L–O brought a motion for a temporary restraining order on December 13, 1984. After a hearing, the Court temporarily restrained Speed Queen from terminating or otherwise modifying the terms of the parties' distributorship agreement, other than as provided for by the WFDL. The Court found that provisions of the WFDL applied to all of L–O's distributorship, and not just to those portions of it which are located in Wisconsin. The Court based this holding on the grounds that the distributorship covers a large area in Wisconsin and that it was established by a contract which was signed in Wisconsin and which provided that Wisconsin law would govern its operation. A preliminary injunction hearing was scheduled by the Court for January 3, 1985, but that hearing was cancelled by the parties.

On December 14, 1984, Speed Queen sent L–O a third notice of termination, covering both the Minnesota and the Wisconsin portions of L–O's territory. This letter notified L–O that the reason for its termination was L–O's overall poor performance during its tenure as a Speed Queen distributor, as evidenced by the decline in Speed Queen's market share in L–O's distribution territory, L–O's poor dealer support, L–O's maintaining insufficient inventories, L–O's failure to obtain execution of Speed Queen's authorized dealership agreements, numerous void counties in L–O's territory, L–O's failure to use promotional money effectively, and L–O's failure to implement Speed Queen marketing strategies.

---

**4.** There is substantial common ownership and management between Merco-Milwaukee and Merco-Minnesota.

In order to rectify the deficiencies set out in the December 14, 1984 letter, Speed Queen required L–O to take four specific actions:

(1) By February 15, 1985, L–O was to develop separate marketing plans for the year 1985 for its counties located in Minnesota and its counties located in Wisconsin. These marketing plans were to address, among other things, the following elements:

a. L–O's 1985 goals for Speed Queen by county and by dealer, including sales volumes;

b. improvements in the void or very weak counties;

c. promotional programs for 1985, with special emphasis on targeted dealers to be sold;

d. L–O's plans for the use of derivative product lines consistent with Speed Queen's marketing strategies;

e. any other strategies, advertising plans, manpower needs, etc., for the year 1985; and

f. a timetable for the implementation of these items.

(2) By February 15, 1985, L–O was to sign up at least 70 percent of L–O's retail dealers as authorized Speed Queen dealers. This would have required that L–O have no fewer than 87 dealers in Minnesota signed to an authorized dealer agreement and no fewer than 25 dealers in Wisconsin signed to an authorized dealer agreement.

(3) By February 15, 1985, L–O was to establish Speed Queen authorized dealers in at least 50 percent of L–O's open Wisconsin counties and 50 percent of L–O's open Minnesota counties. As a part of establishing these dealers, Speed Queen expected authorized dealer agreements to be signed together with a qualifying opening order and display.

(4) During the period from December 14, 1984, to February 15, 1985, L–O was to maintain, at a minimum, inventory levels of equivalent to a six to eight weeks supply, based on L–O's prior year's mov-

ing rate and not counting direct shipments from Speed Queen's warehouse to L–O's customers.

The Court finds that these requirements were reasonably calculated to improve L–O's performance as a Speed Queen distributor and to establish a measure of L–O's performance during the 60 day cure period mandated by the WFDL. The requirements embodied very specific requests which were precisely stated, so that L–O could have had no confusion over what it was expected to accomplish. Moreover, there was no suggestion at the hearing that these requirements were extraordinarily difficult to satisfy during the cure period. Finally, the requirements related directly to concerns which Speed Queen had repeatedly expressed to L–O.

On December 27, 1984, counsel for L–O wrote a letter to counsel for Speed Queen seeking additional information and clarification of certain points contained in the letter of termination. Specifically, L–O's counsel asked Speed Queen to define the kind of marketing program it wanted from L–O in light of the fact that Merco had been appointed as a distributor in direct competition with it. L–O asked Speed Queen what its intentions were with respect "to possible areas of concentration and specialization in ... [L–O's] territory." Speed Queen's counsel Charles Peters responded to L–O's inquiry on January 8, 1985. Peters advised L–O to use its best efforts to promote sales, and indicated that "Speed Queen has no present intentions as to possible areas of concentration and specialization for the competing Distributors in the territory."

There was considerable testimony regarding L–O's performance during the 60 day cure period from December 15, 1984 to February 15, 1985. During this period, L–O did show some increase in sales. L–O sold 12 percent more units in January and February of 1985 than it had during the same months in 1984. Speed Queen did not give L–O a quota during the cure period, so L–O's sales cannot be measured by this standard indicator.[5] If the quotas for the

5. L–O's performance during the cure period could not be measured by its market share,

months of January and February of 1984 are used, however, L–O's sales amounted to 90 percent of Speed Queen's goals. Speed Queen contends that L–O brought about this increase in sales by drastically cutting its prices, and that this policy of discounts was directly contrary to Speed Queen's instructions in its termination letter of December 14, 1984. That letter advised L–O that its efforts were "to be conducted in a manner that is consistent with long term improvement and not designed simply to give short term results." L–O's executives testified that L–O's pricing policies during the cure period were the direct result of fierce competition from Merco, the new distributor appointed by Speed Queen.

The Court finds that L–O's increased sales during the cure period should not be discounted on the ground that they were procured through means that were inconsistent with long term improvement. Given the introduction of Merco into the market, L–O had little choice but to price its products competitively. Notwithstanding this conclusion, the Court has determined that the increase in sales from December 15, 1984 to February 15, 1985 is of little significance with respect to the question of whether L–O effectuated a cure so as to nullify Speed Queen's termination notice. L–O had consistently performed poorly for many months prior to Speed Queen's decision to terminate its distributorship; a slight upturn in sales for a relatively brief period therefore provides scant proof that the termination was unjustified, regardless of the reason for the increase. More importantly, however, the Court has already found that the four requirements set forth in Speed Queen's letter of December 14, 1984 were reasonable. The Court's determination of whether L–O effectuated a

cure, therefore, will be based upon an assessment of the extent to which L–O satisfied the requirements set forth in Speed Queen's letter.

Speed Queen's first requirement was that L–O develop separate marketing plans for the year 1985 for its counties located in Minnesota and its counties located in Wisconsin. L–O totally failed to comply with this request. It submitted absolutely nothing to Speed Queen regarding its marketing and sales strategies. L–O asserts essentially two justifications for its failure to develop and submit such a plan, both of which are unpersuasive. First, L–O contends that Speed Queen's request for a marketing plan was unreasonable because price was the only market consideration after Merco began to compete in the Minnesota territory. While the Court is convinced from the testimony that there was intense price competition during the cure period, that fact does not necessarily obviate the need for any marketing plan. Speed Queen's request asked for information on the planned use of derivative lines consistent with Speed Queen's market approach, improvements in the so-called void counties, and targeted dealers for promotional programs, among other things; a distributor could develop meaningful plans with respect to these items regardless of intense price competition. Moreover, it is not at all clear to the Court that the price war between L–O and Merco would have continued indefinitely, thereby obviating the need for a more complex marketing strategy.[6] Finally, L–O failed to submit even a "plan" which discussed the price war between itself and Merco.[7]

L–O's second justification for its failure to submit a marketing plan is that Speed Queen's request for such a plan was unrea-

---

either, since current market share figures were not available.

**6.** L–O argues that it was compelled to cut its prices in part by the fact that Merco had Speed Queen money available to it during the cure period. This problem was not one which would last indefinitely, since the promotional money was part of a "kick-off" program for new distributors.

**7.** William Cross, L–O's chief executive officer, testified that L–O's plan was to cut its prices in response to Merco's entry into the market, and then to gradually bring them back up over the long term. L–O failed to advise Speed Queen even of this "strategy."

sonable because L–O feared that its pricing information would be disclosed to Merco.[8] L–O did not, however, offer any substantial evidence that Speed Queen was divulging L–O's price information to Merco. Moreover, much of the information requested by Speed Queen simply had nothing to do with price. L–O's justification for its failure to submit a marketing plan is therefore unconvincing.

The second requirement set forth by Speed Queen in its notice of termination and opportunity to cure letter was that L–O sign up at least 70 percent of its retail dealers as authorized Speed Queen dealers by February 15, 1985. L–O introduced evidence at the hearing that by the end of the cure period, it had signed 88.8 percent of its dealers to "authorized dealer agreements." Speed Queen arrived at the much lower figures of 53 percent in Wisconsin and 48 percent in Minnesota, based on a larger number for the dealer base in L–O's territory. The Court will accept L–O's percentages for the purposes of this motion, and will therefore assume that L–O satisfied Speed Queen's second requirement for cure.

Speed Queen's third requirement was that L–O establish authorized Speed Queen dealers in at least half of the void or open counties in its territory by February 15, 1985. L–O did not reach this goal. It signed up only one such dealer during the cure period. The Court further finds that L–O failed to make any significant effort to fill the void counties in its territory.

Speed Queen's fourth and final requirement was that L–O maintain minimum inventory levels of six to eight weeks supply.[9] This requirement contradicted previous statements by Speed Queen's representative Timothy Garbet to L–O that it was maintaining too high an inventory level and that it should attempt to fill more orders through direct shipments from Speed Queen's warehouse. Nevertheless, the Court finds that L–O did maintain the inventory levels requested by Speed Queen, and that it therefore satisfied the fourth requirement.

On February 21, 1985, Speed Queen advised L–O that it had failed to rectify the alleged deficiencies set forth in the December 14 letter and that its Speed Queen distributorship would be terminated effective March 18, 1985. The termination was not based on market share figures for the cure period, since these were not available at the time. Speed Queen based its decision on its conclusion that L–O had failed to fulfill any of the four requirements which it had set forth in its December 14, 1984 termination letter. David Kretz, Speed Queen's vice president for home laundry sales, testified that L–O's failure to submit a marketing plan demonstrated a lack of commitment to Speed Queen, and that he would have wanted to keep L–O as a distributor if it had developed a plan to halt the deterioration in market share in its territory.

Speed Queen agreed to postpone the termination of L–O's distributorship until L–O's motion for injunctive relief was heard by the Court. The Court instructed Speed Queen not to take any further action with respect to L–O's distributorship until the Court announced its decision. On April 17, 1985, the Court advised the parties that it would deny L–O's motion for a preliminary and permanent injunction.

## DISCUSSION

The plaintiff in this case seeks an order preliminarily and permanently enjoining the defendant from terminating its distributorship, pursuant to the Wisconsin Fair Dealership Law (WFDL), Wis.Stat. § 135.01 *et seq.* The WFDL was enacted to equalize bargaining power between parties to a dealership contract and to promote fair dealing. *Id.* § 135.025(2). *Boatland, Inc.*

---

**8.** L–O also points to the fact that Speed Queen did not respond with specific suggestions to its request for clarification in light of Merco's entry into the market. This is an extremely weak excuse for L–O's failure to submit any plan to Speed Queen. The December 14 letter contained a number of specific guidelines for the requested marketing plan.

**9.** The purpose of this requirement was to facilitate immediate filling of orders, according to Jeff Brothers.

*v. Brunswick Corp.*, 558 F.2d 818 (6th Cir. 1977). The WFDL prohibits grantors[10] from terminating, cancelling, failing to renew, or substantially changing the competitive circumstances of a dealership agreement without good cause. Wis.Stat. § 135.03. The grantor of the dealership (in this case the defendant) has the burden of proving good cause. *Id.* The statute defines good cause as follows:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b) Bad faith by the dealer in carrying out the terms of the dealership.

*Id.* § 135.02(4).

If a grantor decides to terminate or substantially modify a dealership agreement, it must give the dealer[11] 90 days notice of the termination or modification. Wis.Stat. § 135.04. Finally, the grantor must notify the dealer that it has 60 days in which to cure the claimed deficiencies, and that if these deficiencies are cured within 60 days, the notice to terminate is void. *Id.*

The WFDL specifically provides that injured parties under the statute may bring an action for injunctive relief and damages, including actual costs and reasonable attorneys' fees. Wis.Stat. § 135.06. The statute presumes that any violation of its re-

quirements constitutes irreparable injury to a dealer for the purposes of determining whether or not a temporary injunction should issue. *Id.* § 135.065.

There is no question in the present case that the distributorship agreement between the parties established a "dealership" under the WFDL,[12] entitled to the protections provided by the statute. Moreover, the Court finds that the plaintiff is "situated in" Wisconsin, so that it is within the statutory definition of "dealer" and therefore covered by the WFDL.[13] The issues before the Court, then, are whether the defendant gave the plaintiff the notice of termination and opportunity to cure required by the WFDL and whether the defendant had good cause to terminate plaintiff's distributorship.

**A. Notice of termination and opportunity to cure**

■ The procedural requirements of the WFDL are that the grantor provide the dealer with 90 days notice of the proposed termination and 60 days in which to cure specified deficiencies. Wis.Stat. § 135.04. Speed Queen satisfied these requirements with its letter of December 14, 1984. This letter informed L–O that its distributorship would be terminated on March 18, 1985 if it did not effectuate a cure, thus giving L–O slightly more than the 90 days notice required by the WFDL. Second, the December 14 letter set forth four specific cure requirements, and requested that they be satisfied by February 15, 1985, the 60 day

---

**10.** A "grantor" is statutorily defined as "a person who grants a dealership." Wis.Stat. § 135.02(5).

**11.** A "dealer" is statutorily defined as a grantee of a dealership situated in Wisconsin. Wis.Stat. § 135.02(2). The terms "dealer" and "distributor" are used interchangeably throughout this opinion.

**12.** Under the Act, a "dealership"

means a contract or agreement, either expressed or implied, whether oral or written, between 2 or more persons, by which a person is granted the right to sell or distribute goods or services, or use a trade name, trademark, service mark, logotype, advertising or other commercial symbol, in which there is a

community of interest in the business of offering, selling or distributing goods or services at wholesale, retail, by lease, agreement or otherwise.

Wis.Stat. § 135.02(3).

**13.** The Court's conclusion that the WFDL applies to both the Minnesota and Wisconsin portions of plaintiff's territory is based on three facts. First, while the majority of plaintiff's sales are in Minnesota, its distributorship includes a substantial portion of the state of Wisconsin. Second, the parties have always treated the Minnesota and Wisconsin portions of the territory as a single distributorship. Third, the distributorship agreement entered into between the parties specifically provides that it is to be governed by Wisconsin law.

period prescribed by the statute. Each requirement was precisely defined and capable of being achieved within the 60 day period. L–O was therefore afforded the procedural rights it was entitled to under the WFDL. The more complex issue in the instant case is whether Speed Queen had good cause to terminate L–O as a distributor.

## B. Good cause

Under the WFDL, the determination that a manufacturer such as Speed Queen has "good cause" to terminate one of its dealerships has two components. First, the dealer must fail to comply substantially with the manufacturer's "essential and reasonable requirements." Wis.Stat. § 135.02(a). Second, these requirements must not be discriminatory when compared with the requirements imposed on "similarly situated dealers." *Id.*

There is not a great deal of case law on the question of what constitutes good cause under the WFDL. The most extensive discussion of good cause is found in *Al Bishop Agency, Inc. v. Lithonia Division of National Service Industries, Inc.*, 474 F.Supp. 828 (E.D.Wis.1979).[14] The plaintiff in *Al Bishop Agency* distributed fluorescent lights and high intensity lamps manufactured by the defendant. Defendant notified the plaintiff that it was terminating its dealership for two reasons: (1) poor performance in attaining certain sales goals established by defendant; and (2) defendant's lack of security given the fact that plaintiff's accountant recommended that plaintiff drop defendant's line of products and that plaintiff threatened to drop defendant's line if defendant continued to pressure plaintiff to hire additional sales personnel. The court held that plaintiff's failure to meet defendant's sales goals constituted good cause for termination under

the WFDL.[15] These goals were based upon the number of square feet of building construction taking place in the sales area and the dollar volume of sales of defendant's products that could be expected per 1,000 square feet of construction. While plaintiff's total sales, and sales of defendant's high intensity lamp, were above the company average, it did not meet its goal for sales of fluorescent lights. The court found that the defendant was justified in requiring plaintiff to meet a certain quota with respect to the fluorescent lights, since they were the defendant's most important product. 474 F.Supp. at 834. Finally, the court held that the termination was non-discriminatory, since sales goals were imposed on dealers similarly situated to the plaintiff and since the defendant offered proof that it terminated dealerships that consistently failed to meet these goals or that did not take steps to improve sales.

Plaintiff makes four arguments in support of its position that defendant has not complied with the good cause requirement. First, plaintiff argues that the defendant's requirements were not "essential or reasonable" as required by the WFDL. Second, plaintiff contends that it substantially complied with defendant's requirements. Third, plaintiff argues that defendant's requirements are discriminatory. Fourth, plaintiff contends that the reasons for the termination set forth in the December 14, 1984 letter are a pretext, and that defendant actually wishes to split plaintiff's distributorship into two territories, Minnesota and Wisconsin, so that it can avoid the requirements of the WFDL. In assessing the plaintiff's arguments, and the issue of good cause, the Court must consider the defendant's initial justification for deciding to terminate plaintiff's distributorship in December of 1984, as well as defendant's

---

**14.** *See also Reinders Bros. v. Rain Bird Eastern Sales Corp.*, 476 F.Supp. 438 (E.D.Wis.1979), *modified,* 627 F.2d 44 (7th Cir.1980) (plaintiff dealer's acquisition of a distributorship from a competitor of the grantor does not constitute good cause).

**15.** The court also held, however, that defendant's subjective feelings of insecurity could not

form a good cause basis for termination, noting that a contrary ruling would allow grantors to terminate dealerships at will. The court further held that the plaintiff's failure to hire an additional sales person did not constitute good cause, since the actual problem was plaintiff's failure to meet the sales goals. 474 F.Supp. at 834.

efforts to effectuate a cure during the ensuing 60 day statutory cure period. While the latter inquiry is the critical component in the good cause determination, it can only be understood in the context of the defendant's original decision to terminate the distributorship.

■ Plaintiff's first and most fundamental argument is that the defendant's requirements were neither reasonable nor essential. The plaintiff sets forth the following proposed standard for "good cause":

> [T]o terminate a dealer it is not enough that a dealer targeted for termination is not the best dealer or even an average dealer—by definition some dealers must always be "below average." Rather, to be terminated a dealer must be utterly inadequate, that is, unable to comply even substantially with reasonable and essential goals.

Plaintiff's Memorandum in Support of Motion for Preliminary Injunction, at 13. Plaintiff argues that while it may not be one of the defendant's best distributors, defendant does not have good cause to terminate it under the above proposed standard, since it has substantially met its sales goals (85 percent). The Court cannot accept plaintiff's argument. Plaintiff cites no authority for its proposed standard, and the Court finds that this standard is far too strict. The Court agrees with the defendant that the WFDL is intended to prevent the arbitrary and capricious termination of dealerships, and not to afford tenure to nonproductive dealers. The decision in *Al Bishop Agency* stands for the clear proposition that grantors may terminate dealerships that fail to achieve reasonable sales goals. In the instant case, the plaintiff failed to meet such goals; the plaintiff's performance as a Speed Queen distributor was poor by any standard. The defendant was justified in sending a notice of termination to the plaintiff, given the plaintiff's declining market share and its failure to meet its sales quotas.

■ Plaintiff also contends that the four requirements set forth in defendant's notice of termination were neither reasonable nor essential. The Court has already determined in the factual portion of this opinion that these four requirements were reasonable, and need not repeat that analysis here. The fact that the grounds for the initial decision to terminate are different from the four "cure" requirements imposed by the defendant does, however, merit some comment. Defendant's initial decision to terminate plaintiff's distributorship, as outlined above, was based primarily on the plaintiff's decline in market share. The defendant did not, however, simply require that plaintiff increase its sales or market share by a certain percentage in order to effectuate a cure. Rather, the defendant required that plaintiff submit a detailed marketing plan, sign up a certain percentage of dealers as authorized Speed Queen dealers, reduce the number of void counties in its territory, and maintain adequate levels of inventory. Jeffrey Brothers testified that the defendant chose not to ask plaintiff to achieve a certain level of sales during the cure period because its concern was with long term growth in the territory. Given the poor performance which plaintiff had exhibited over a substantial period of time, defendant's concern was justified. Further, each of the cure requirements set forth in defendant's December 14, 1984 notice of termination were rationally related to the goal of increased sales and market share growth over the long term. It was therefore fully appropriate for defendant to make the final decision whether to terminate on the basis of criteria other than sales figures during the cure period. This is especially true given the fact that market share figures for the cure period were not available when defendant made the final decision to terminate the distributorship in mid-February of 1985.

■ Plaintiff's second argument that defendant lacked good cause to terminate the distributorship is that plaintiff substantially complied with defendant's requirements. This argument must fail. Plaintiff consistently failed to meet defendant's legitimate sales expectations, and it fulfilled only two of the four cure requirements set forth in defendant's notice of termination letter.

■ Plaintiff's third argument is that the requirements imposed by the defendant were discriminatory. It is clear that the initial decision to terminate due to poor sales performance was not discriminatory. During the period between August of 1983 and December of 1984, six Speed Queen distributorships were terminated for failure to achieve market share growth in their respective territories. Speed Queen has a clear policy of terminating distributorships that fail to increase their market share. Plaintiff's argument that the termination was discriminatory centers on the fact that defendant appointed Merco as a distributor in plaintiff's territory at the same time it notified plaintiff that it would be terminated unless a cure was effectuated. There is no question that Merco's appointment caused confusion in the market place. Moreover, as the Court has found, the entry of Merco into the market place touched off a price war. Nevertheless, the Court has determined that the appointment of Merco did not render the plaintiff's termination discriminatory. Plaintiff's contract explicitly provided that its distributorship was non-exclusive, *i.e.*, that defendant could appoint other distributors in plaintiff's territory. More importantly, however, Merco's presence in the market did not render it difficult for plaintiff to effectuate a cure. Plaintiff could have submitted a marketing plan and signed up retail dealers in its void counties notwithstanding the competition with Merco.[16] The Court must therefore reject plaintiff's argument that the termination was discriminatory.

■ Plaintiff's final contention is that the reasons for termination set forth in defendant's December 14, 1984 letter are a pretext, and the defendant actually wants to split plaintiff's territory into a Minnesota distributorship and a Wisconsin distributorship, so as to avoid the requirements of the WFDL. In support of this argument, plaintiff points to the fact that defendant required plaintiff to submit two separate marketing plans during the cure period—one for Minnesota and one for Wisconsin. Plaintiff also points out that defendant coupled this requirement with a demand that it execute two new distributorship agreements for what would be separate Wisconsin and Minnesota territories. Plaintiff argues that the demanded modification would have constituted a substantial change in the competitive circumstances of the agreement so as to require good cause, Wis.Stat. § 135.03, and that the demand itself violated the Court's Temporary Restraining Order of December 13, 1984.[17] Without reaching the question of whether it was appropriate for defendant to request that plaintiff sign two new agreements, the Court finds that such request does not compel a finding that the defendant lacked good cause to terminate the plaintiff's distributorship. The defendant did not terminate the distributorship due to plaintiff's refusal to sign the new agreements. Rather, the plaintiff's distributorship was terminated due to its poor performance and its failure to satisfy the defendant's cure requirements. The fact that the defendant attempted to get the plaintiff to sign new distributorship agreements therefore does not vitiate defendant's good cause to terminate the distributorship.

## CONCLUSION

The plaintiff in this case performed poorly as a wholesale distributor of defendant's laundry product throughout its tenure as a distributor. Plaintiff's sales statistics consistently placed it among the worst performers in defendant's distribution network. Most importantly, after almost two and one-half years as a distributor of the defendant's products, plaintiff had failed to achieve any growth in market share. Such growth is extremely important to the defendant's business, and is an integral part of an aggressive merchandising approach of which the plaintiff and distributors in

---

**16.** The Court notes that Merco's presence in the market did not prevent plaintiff from maintaining its inventory levels as requested by defendant or from obtaining the required percentage of authorized dealer agreements.

**17.** That Order restrained the defendant from terminating or otherwise modifying the parties' distributorship agreement other than as provided for in the WFDL.

general are well aware. Defendant has a clear policy of terminating distributorships which do not successfully implement its merchandising strategy or increase their market share. In the instant case, the defendant understandably took steps to replace the plaintiff with a new distributor after a lengthy period of poor performance. The defendant afforded the plaintiff the procedural notice rights to which it was entitled under the WFDL. The defendant articulated four precise and reasonable cure requirements. The plaintiff did not fully meet those requirements. Under these circumstances, the defendant had good cause to terminate plaintiff's distributorship, and therefore complied with the requirements of the WFDL.

Accordingly, IT IS ORDERED that plaintiff's motion for a preliminary and permanent injunction is denied.