OPINION
Plaintiff-appellant, John S. Wagoner, appeals from a decision of the Montgomery County Court of Common Pleas awarding summary judgment in favor of defendants-appellees, Leach Co. ("Leach") and Best Equipment Co. ("Best"). Wagoner was a long-time distributor of Leach products until Leach terminated their distributorship contract. Wagoner sued Leach for breach of contract, alleging that the company had violated the contractual provision governing termination and notice. Wagoner also sued Best, a business competitor who was seeking to step into Wagoner's relationship with Leach, for tortious interference with a contract. In addition, Wagoner pursued a civil conspiracy claim against both defendant companies.
In granting summary judgment in favor of Leach, the trial court held that the company had given adequate notice under its contract's termination provision. Pursuant to that provision, the trial court found Leach notified Wagoner of certain deficiencies in his performance, and Wagoner did not adequately respond within the time allowed. However, following Wisconsin law, which governed the distributorship contract due to a choice of law provision, we reverse the court's judgment on this question. We hold that the reasonability of Leach's actions and the adequacy of Wagoner's response were questions of fact that prevented resolution by summary judgment.
We reverse also the court's judgment in regard the tortious interference claim against Best. Again, we find that factual questions existed preventing summary judgment. Evidence put forward by Wagoner was sufficient to support an inference that Best purposely and knowingly induced Leach to breach its contract with Wagoner.
We affirm the trial court's grant of summary judgment on the civil conspiracy claim, however. Our court does not recognize an action for civil conspiracy based on breach of contract.
 I.
The pertinent facts of the case are as follows. John S. Wagoner is the sole proprietor of a business known as Midwest Epoke. Through Midwest Epoke, Wagoner was in the business of selling street sweepers, catch basin cleaners, and related equipment. Leach is a manufacturer of street cleaning equipment incorporated under the laws of Wisconsin, with its principal offices in that state.
On October 1, 1988, Wagoner and Leach entered into a "Sales and Service Agreement" granting Wagoner the right to market and distribute a number of Leach's product lines, including VAC/ALL sweepers and related products, Selecto Spreaders, and Super Vac Leaf Loaders. The agreement gave Wagoner distributorship responsibilities for nineteen counties in southwestern Ohio, three counties in eastern Indiana, and three in northern Kentucky. In return, the agreement made Midwest Epoke the authorized dealer for these Leach product lines in each of these counties. As authorized dealer, Midwest Epoke serviced all users of Leach equipment within its territory and received discounts and special terms on Leach products. A choice-of-law provision stated that Wisconsin substantive law would govern the contract's terms.
The contract between Leach and Wagoner also contained a clause, governing termination of the dealership. The clause read as follows:
 TERMINATION
This Agreement shall continue in force until (1) the Company gives the Distributor ninety (90) days notice of cancellation in writing, stating the reason(s) for termination and shall provide Distributor sixty (60) days in which to rectify any claimed deficiency; or (2) the Distributor gives the Company thirty (30) days written notice of termination, in which event this Agreement shall be terminated thirty(30) days after the Company's receipt of such notice. After notice of intention to terminate is given by either party to the other, the Company at its option may establish terms of cash with order or C.O.D. on any and all Goods delivered to the Distributor.
 One of the central disputes in this case turns on the proper construction of this clause.
Best Equipment is also in the business of selling street sweepers and catch basin cleaners, as well as other refuse collection equipment. Best operates in Indiana and Southwest Ohio. In May, 1995, Best hired a salesman for Ohio and wrote letters to manufacturers offering to represent them in Ohio, with some manufacturers agreeing to switch their accounts to Best. At the time, Best sold both Leach's VAC/ALL products and its garbage trucks in Indiana as an authorized dealer. When Best moved into Southwest Ohio, its goal was to offer the same product lines that it offered in Indiana. In July, 1996, Best became the authorized dealer of Leach garbage trucks for Southwest Ohio.
Sometime before February, 1997, Best began eyeing Wagoner's territory as a place in which to expand its VAC/ALL sales. In January of 1997, Michael Dahlmann, Best's president; Mark Wardlaw, Best's Ohio sales representative; and Jack Wentz, General Sales Manager of Leach, had dinner together in Dayton Ohio. Wentz indicated at that time that Leach was reconsidering its relationship with Wagoner and Midwest Epoke.
On February 18, 1997, Dahlmann wrote a letter to Leach stating that Best was "eager to get [its] teeth into this new territory." Best had ordered its sales representative, Mark Wardlaw, to check into sweeper sales in Southwest and Central Ohio by querying his customers on sales calls. In the letter, Dahlmann reported that Wardlaw had discovered seventeen sweepers purchased from other manufacturers in the last two years. Dahlmann criticized what he viewed as Wagoner's ineffective sales strategy. Dahlmann duly noted that a number of these seventeen sweepers were mechanical sweepers, a different type of product than VAC/ALL sweepers, but he questioned whether some of those purchases "could have been turned around with an aggressive strategy." Dahlmann did not note, however, that eight of the seventeen listed sweepers, which were sold to the City of Columbus, fell outside of Wagoner's territory.
Making his plea for Best to take over Wagoner's territory, Dahlmann commented in the letter, "My concern, Jack [i.e. Jack Wentz], is that if a change is inevitable, what are we waiting for except to avoid the unpleasantness of the cancellation process?" He added, "As grateful as we would be to be the new dealer, to get the line in mid to late summer would mean we would effectively lose `a season' and all the opportunities it offers. Our E10 demo should be ready by mid-April." Dahlmann closed the letter by pledging to update Leach with future reports on sweeper sales in Wagoner's territory.
Sometime during the spring and summer of 1997, Mark Wardlaw made sales calls to a number of potential customers in Southwest Ohio. Wardlaw told some of these customers that Best expected that it would soon be the authorized VAC/ALL dealer in Southwest Ohio. Best also demonstrated VAC/ALL products in Wagoner's sales territory based on the company's belief that Leach's sales territories were non-exclusive. One provision in the agreement between Leach and Wagoner stated that Leach was "not liable for any commissions on sales or leases made by it, other distributors or dealers" in Wagoner's territory. When Wagoner complained to Jack Wentz by letter about Best's infringement into his territory, Wentz responded, "[W]hile we do encourage all distributors to market and sell our products within their respective sales areas, we cannot restrict their activities."
On July 16, 1997, Wentz sent a letter to Wagoner stating his company's concerns with Midwest Epoke's marketing strategy. Wentz noted particularly Leach's concern that additional sales representatives were needed to compete with other manufacturers. Pursuant to the termination provision of their distributorship agreement, Wentz gave Wagoner sixty days to "develop a detailed sales and marketing plan that would restore Leach Company's trust and confidence in Midwest Epoke's ability to actively call on, pursue and receive orders from its area of primary sales responsibility." Wentz also asked Wagoner for his mutual agreement to terminate the contract immediately, and he attached a contract form to that effect. He notified him that, in the interim, Leach would be seeking new representation and that all VAC/ALL sales inquiries should be sent directly to Leach.
In response to this letter, Wagoner wrote Wentz requesting that Leach send him a list of specific deficiencies that the company was raising with his performance. Wagoner noted that, under the contract, he had sixty days to rectify any claim of deficiency. Wagoner also complained that any attempt by Leach to replace him or bypass him in the interim would be a breach of contract.
In addition to this direct response to Wentz, Wagoner also wrote to Frederick Leach, president of the Leach Company. In his letter, Wagoner reminded Leach that he had been selling the Leach family's products for almost thirty years, and he appealed to Leach's sense of loyalty. He asked to set up a meeting with Leach to discuss the matter. As a consequence of this letter, a meeting was scheduled for August 29, 1997.
On August 6, Wentz sent a letter to Wagoner setting out six specific deficiencies that Wagoner had to remedy. They were listed as follows:
1. Employ and maintain a full-time committed Outside Sales staff, in addition to yourself.
2. Employ and maintain a full-time Service person to provide field service capability throughout the assigned sales territory.
3. Provide a full-time Inside Sales support staff person to answer the telephones and inquiries on sales and service related business functions (not an answering machine).
4. Stock and maintain a repair parts inventory relative to unit population.
5. Purchase and maintain a current year demonstrator sweeper/catch basin unit capable of responding to demonstration requirements on short notice.
6. Have available a qualified, trained person to demonstrate the distributor-owned demonstrator.
 In addition, Wentz demanded that Wagoner provide Leach with audited current financial statements. Wentz also demanded that any marketing plan Wagoner developed "must address Leach Company's loss of trust and confidence in Midwest Epoke's capability to develop all opportunities." Finally, Wentz informed Wagoner that he would attend the August 29 meeting between Wagoner and Leach.
In the meantime, Best sales representative, Mark Wardlaw, wrote another letter to Leach about Wagoner's territory in Southwest Ohio. Wardlaw said that the intent of the letter was to "step-up" Best's campaign efforts for the VAC/ALL line. Wardlaw noted five instances in which he discovered potential customers to whom Wagoner had not effectively marketed VAC/ALL sweepers. He closed by stating, "If Vac/All — Midwest Epoke was a marriage, divorce would be inevitable. It is time for a company, who believes in making sales calls and doing demos (what a concept), to properly represent Vac/All in southwest Ohio. A good candidate for this task is, of course, Best Equipment Co., Inc."
Apparently the August 29 meeting with Frederick Leach did not go well for Wagoner. Shortly after the meeting, on September 23, 1997, Frederick Leach wrote him a letter reiterating his company's disappointment with sales in Southwest Ohio. Leach informed Wagoner that he had until October 6, sixty days from Wentz's August 6 letter, to remedy all six deficiencies and restore Leach's confidence in Midwest Epoke's ability to represent its product.
On October 6, Wagoner sent an addendum to an earlier issued marketing plan attempting to rectify some of the deficiencies Wentz had enumerated. Wagoner complained, however, that, in his opinion, Leach had already decided to terminate the agreement and all of its actions since the July 16 letter were intended to justify that decision retroactively. In response to point one, Wagoner committed himself to hiring a full-time sales person. Nonetheless, he did not actually hire one because, he explained, he felt it unfair to hire someone until he could assure them that they would have a product to sell. Wagoner stated that he had satisfied points three and four by purchasing a voice-mail system and increasing his spare-parts stock, respectively. He also stated that point six was already satisfied, presumably by himself. Wagoner complained, however, that points two, three, and five were unreasonable and intentionally chosen to make it financially impossible for him to comply. He refused, therefore, to hire a full-time service person or purchase a demo unit. In regard to the latter, Wagoner claimed that Midwest Epoke was being singled out among all of Leach's dealers to make such a purchase.
On October 7, 1997, Bernard Howaniec, Vice President of Sales and Marketing for Leach, wrote Wagoner a letter informing him that his response to Leach's concerns was inadequate. Howaniec remarked that Wagoner had only modified its marketing plan and had not taken the direct actions required by Leach. As a consequence, Howaniec informed Wagoner that his contract with Leach would terminate effective November 6, 1997.
On November 14, 1997, Wagoner filed suit against Leach for breach of contract, against Best Equipment for tortious interference with a contract, and against both parties for civil conspiracy. Leach filed a motion for summary judgment on July 8, 1998. Best followed suit on August 18, 1998. Wagoner filed memoranda opposing both motions. On November 25, 1998, the trial court issued an order granting Best's motion for summary judgment, which order it amended on November 30. Also on November 30, the trial court granted summary judgment in favor of Leach Co. Wagoner now appeals from the trial court's judgment.
 II.
Wagoner raises as his first assignment of error the following:
 THE TRIAL COURT ERRED IN HOLDING THAT APPELLEE LEACH COMPANY LEGALLY TERMINATED THE CONTRACT BETWEEN APPELLANT JOHN S. WAGONER DBA MIDWEST EPOKE AND APPELLEE LEACH COMPANY PURSUANT TO THE TERMS OF THE CONTRACT BY HOLDING THAT THE AUGUST 5, 1997 LETTER MAY BE CONSIDERED AS PROPERLY COMMENCING THE TERMINATION BECAUSE IT SPECIFICALLY DETAILED THE REASONS FOR THE TERMINATION. THIS WAS ERROR BECAUSE NOWHERE IN THE LETTER OF AUGUST 5, 1997 IS TERMINATION OF ANY KIND, EITHER UNILATERAL TERMINATION OR TERMINATION BY AGREEMENT, MENTIONED AND, FURTHER, THE FIRST PERTINENT LETTER, NAMELY, THE LETTER OF JULY 16, 1997, DOES NOT MENTION A UNILATERAL TERMINATION PURSUANT TO THE TERMS OF THE CONTRACT BUT RATHER REQUESTS A MUTUAL AGREEMENT TO TERMINATE.
 With this rather lengthy assignment of error, Wagoner challenges the adequacy of Leach's notice to him that the contract would expire in ninety days. The essence of his argument is that Leach did not explicitly announce in its correspondence with him that it was terminating the distributorship contract ninety days before doing so.
The termination provision in question stated, in relevant part: "This Agreement shall continue in force until * * * the Company gives the Distributor ninety (90) days notice of cancellation in writing, stating the reason(s) for termination and shall provide Distributor sixty (60) days in which to rectify any claimed deficiency." The July 16, 1997 letter from Jack Wentz invoked this provision, but only in regard to the sixty-day cure period. Wentz wrote:
 Per the sales contract, Leach Company "shall provide the distributor sixty (60) days in which to rectify any claim of deficiency". Sixty (60) days in this case would be September 14, 1997. If Midwest Epoke elects to again develop a detailed sales and marketing plan that would restore Leach Company's trust and confidence in Midwest Epoke's ability to actively call on, pursue and receive orders from its area of primary responsibility, Leach Company would reconsider our decision.
Given the situation, we are respectfully requesting your mutual agreement to terminate, effective immediately our Sales and Service Agreement dated October 1, 1988. We would sincerely appreciate your signature on the mutual agreement of contract termination, form enclosed. Please return both copies to my attention. A signed copy will be returned for your records.
We will be seeking new representation and would in the interim request you refer all Vac/All inquiries to us.
 As Wagoner notes, a later August 5, 1997 letter from Wentz also addressed Wagoner's time for cure without explicitly discussing termination in ninety days. The first express reference to a termination date did not appear until Frederick Leach's letter of September 3, 1997. Therein, Leach said that if Wagoner did not remedy the deficiencies Wentz had cited by October 6, his company would terminate the agreement immediately.
Although Wentz did not specifically say in his July 16 letter that Leach was giving its ninety-day notice, we nevertheless find that this letter was sufficient notice to trigger the termination provision of the distributorship contract. By informing Wagoner that he had sixty days to rectify certain deficiencies, Wentz effective invoked the termination provision. The necessary implication was that termination would follow from a failure to rectify. Furthermore, no reasonable person could fail to grasp from this letter that Leach was announcing its intention to terminate its agreement with Wagoner. Indeed Wagoner, in his July 24, 1997 letter to Frederick Leach, indicated that he knew he was facing cancellation of his dealership. Where a contract requires written notice of termination, a writing that is sufficient to give such notice ought to satisfy the contractual requirement. It should not be necessary for a party to recite any particular "magic words" unless the contract so specifies.
Moreover, the failure of the July 16 letter to specify the pending date of termination does not mean that the notice given was insufficient under the contract. As already noted, Wisconsin substantive law governs the contract between Leach and Wagoner by virtue of a choice-of-law provision. Under Wisconsin law, when notice of termination is given according to the provisions of a contract, it is not necessary to cite the date of termination. See Amberg Granite Co. v. Marinette Cty. (1944), 247 Wis. 36, 46,18 N.W.2d 496. The period of notice simply runs from the date that notice is received, and the termination becomes effective when the period of notice expires. See id.
Accordingly, appellant's first assignment of error is overruled.
 III.
As his second assignment of error, Wagoner raises the following:
 THE TRIAL COURT ERRED IN GRANTING APPELLEE LEACH COMPANY SUMMARY JUDGMENT BECAUSE A GENUINE ISSUE OF MATERIAL FACT WAS CREATED AS TO WHETHER APPELLANT JOHN S. WAGONER DBA MIDWEST EPOKE RECTIFIED THE DEFICIENCIES, NAMELY, A GENUINE ISSUE OF MATERIAL FACT WAS CREATED BY APPELLANT'S OCTOBER 6, 1997 "ADDENDUM TO MIDWEST EPOKE'S MARKETING PLAN."
 Here, Wagoner challenges the trial court's determination that there were no genuine issues of material fact with regard to whether Leach had complied with the termination provisions of the distributorship contract. Wagoner argues that the contract required Leach's claims of deficiency to be reasonable and that Wagoner's attempts to rectify be judged by a reasonable person standard. Both points, Wagoner claims, raised questions of fact that should have prevented summary judgment.
In interpreting the distributorship contract, the trial court read the termination clause as requiring Leach to give both ninety days notice and a sixty-day cure period. Leach had argued below that it could terminate the agreement with ninety days notice without giving Wagoner a chance to cure, but the trial court rejected that argument. Although the court accepted Wagoner's view that cure was available, it still granted summary judgment in favor of Leach. The court held that Wagoner had sixty days to rectify the deficiencies noted in Leach's correspondence. Since Wagoner did not rectify those deficiencies in sixty days, but only presented a marketing plan, the trial court held that Leach was within its rights to terminate the agreement. The court characterized Leach's ability under the contract to claim deficiencies and decide whether they had been satisfied as arising from an "at-will agreement."
In reviewing the trial court's disposition of this question, we note again that we are bound by Wisconsin substantive law of contract. Nevertheless, for questions of procedure, the law of the forum state governs. Guider v. LCI Communications HoldingsCo. (1993), 87 Ohio App.3d 412, 417; see also Restatement of the Law 2d, Conflict of Laws (1971), Section 122. Therefore, the Ohio standard of review for summary judgment applies in this case — not that we are aware of any relevant difference between Ohio and Wisconsin law in that regard.
In Ohio, summary judgment is appropriate when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made.Harless v. Willis Day Warehousing Co. (1976), 54 Ohio St.2d 64,66. The moving party "bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on the essential element(s) of the nonmoving party's claims." Dresher v. Burt (1996), 75 Ohio St.3d 280,293. Then, once the moving party has met that burden, the non-moving party has a reciprocal burden of showing that an issue of material fact does exist. Id. The propriety of summary judgment is a question of law. Am. States Ins. Co. v. Guillermin
(1996), 108 Ohio App.3d 547, 552.
Under Wisconsin law, the interpretation of written instruments is a question of law, absent any ambiguity. See Kinn.v. Coast Catamaran Corp. (E.D. Wis. 1984), 582 F. Supp. 682, 686. If a contract's terms are plain and unambiguous, the contract must be construed as it stands. Keller v. Keller (Wis.App. 1997)214 Wis.2d 32, 37, 571 N.W.2d 182, 184. Nevertheless, an ambiguity in a contract may create a triable question of fact. See Mgt.Computer Servs., Inc. v. Hawkins, Ash, Baptie Co. (1996),206 Wis.2d 158, 177-178, 557 N.W.2d 67, 75. In this case, to the extent that any ambiguity in the contract creates a factual question, we must resolve all such questions in favor of Wagoner, because of his position as the party opposing summary judgment.
First, we will consider the interpretation of the termination clause advanced by Leach. Leach argued below that the termination clause, by its plain language, gave the company two distinct means of canceling its agreement. According to Leach, it could either (1) terminate the agreement for any reason upon ninety days notice or (2) terminate for a deficiency after giving Wagoner sixty days to cure. We choose to address this interpretation although we are not certain that Leach wishes to maintain this position on appeal. In a footnote within its appellate brief, the company states that it is willing to concede for the purposes of appeal that the termination clause required it to give both ninety days notice and sixty days cure. Elsewhere in the brief, however, the company appears to be reasserting the same argument. The brief states, for example, "The contractual provision at issue in these proceedings unequivocally provides Leach with an absolute right to terminate its contract with Wagoner * * * limited only by Wagoner's right to receive notice of Leach's intent to unilaterally terminate." Leach also argues in its brief that, even if Wagoner cured specific the deficiencies that Leach enumerated, the company could still terminate the contract. Thus, despite the apparent concession, we feel it necessary to address the proffered interpretation.
Doing so, we conclude that the trial court was correct to reject Leach's interpretation. The termination clause required that Leach give Wagoner "ninety (90) days notice of cancellation in writing, stating the reason(s) for termination and shall
provide Distributor sixty (60) days in which to rectify any claimed deficiency." (Emphasis added.) The plain meaning of this provision is unavoidable. In order to terminate the agreement, Leach had to (1) give ninety days notice in writing (2) explain the reason for the termination and (3) give Wagoner sixty days to cure whatever prompted the termination. It should not be necessary for this court to elaborate too much upon the meanings of the words "and" and "shall." In this context, we think it sufficient to say that the word "and" is conjunctive both in its meaning and grammatical function, and it is generally not the same as the word "or." The word "shall" ordinarily denotes command rather than option, and it is generally not the same as the word "may." Thus, the agreement did not give Leach several options as to how it might terminate its relationship with Wagoner; it gave one means of termination with several intervening duties.
The notion, advanced by Leach, that it could terminate the contract even if Wagoner remedied claimed deficiencies within sixty days is little more than pettifoggery. The plain implication of any contract clause giving one party time to cure is that, if a party successfully cures, then the other party may not terminate the contract. Otherwise, the time for cure has no meaning. See Quill v. R.A. Invests. Corp. (1997) 124 Ohio App.3d 653,661 ("A right to cure exercised at an opposing party's option is no right at all."). Leach's interpretation reduces the clause's command to mere surplusage. In Wisconsin, courts give the terms of a contract reasonable meaning so that no part is rendered surplusage. Koenings v. Joseph Schlitz Brewing Co.
(1985), 126 Wis.2d 349, 366, 377 N.W.2d 593, 602. Thus, we agree with the trial court that, in order to terminate the contract, Leach had to give Wagoner a period of cure.
Even having found that Leach owed Wagoner a period of cure, the trial court held that Wagoner failed to make that cure as a matter of law. This raises a more difficult question of interpretation. According to the trial court:
 The termination clause does not set forth any requirements as to Leach's discretion in deciding whether proper action has been taken by a distributor in rectifying deficiencies. The agreement merely states that a sixty day period be given to the distributor to rectify the deficiencies. The Court thus finds that Leach complied with the terms of the agreement. Further, the Plaintiff argues that Leach stated deficiencies in Plaintiff's performance which were not contemplated by their Sales and Service agreement. The Court finds, however, that the termination clause in the parties' agreement set forth no specific deficiencies upon which Leach could base its decision to terminate. The Court cannot conclude that there are genuine issues of fact as to whether Leach breached such an at will agreement. Thus, the Court holds that Leach is entitled to judgment as, a matter of law, on the Plaintiff's claim for breach of contract.
 The question raised here is not whether the cure provision applied at all, but what standard applied when the cure provision was invoked. We agree with the trial court that the agreement was silent about what standard Wagoner's performance was to judged against in deciding whether there was a "deficiency" or in deciding whether such a deficiency had been remedied. We conclude, however, that the trial court erred in resolving that silence in favor of Leach.
In the first place, the agreement was not terminable "at will" as the trial court suggested. The termination provision very clearly set limits on Leach's ability to terminate the contract. Leach had to give both notice and a period of cure. It is a misnomer to refer to such a contract as being terminable "at will."
Second, the silence as to any applicable standard, at the very least, created an ambiguity, which could not be resolved against Wagoner in summary judgment. If the provision did not expressly demand that Leach act reasonably in claiming deficiencies and in considering Wagoner's attempts at rectification, no more did it expressly grant Leach unbridled and unreviewable discretion to act as the company deemed fit. In resolving this dispute in favor of Leach, the trial court essentially gave Leach that sort of discretion. By doing so, the trial court failed to apply the standard of summary judgment that resolves factual questions in favor of the non-movant.
Furthermore, there are canons of construction that require ambiguities to be read against the drafting party; see HunzigerConstr. Co. v. Granite Resources Corp. (Wis.App. 1995),196 Wis.2d 327, 339, 538 N.W.2d 804, 809; and in ways that give meaning and effect to each portion of the contract; Kohler Co. v. Wixen
(1996), 204 Wis.2d 327, 555 N.W.2d 640, 644. These rules of construction also persuade us against the trial court's interpretation of the clause in Leach's favor.
Indeed we conclude, as a matter of law, that the termination provision required Leach to act according to an objective standard of reasonability. Were we to hold otherwise, the cure provision would be drained of all meaning, and termination could follow from the most absurd demands by Leach. "When interpreting ambiguous provisions of a contract, the court must select a construction which gives effect to each part of the contract and reject constructions resulting in surplusage or unreasonable results."Kohler, 555 N.W.2d 640, 644. By reducing the termination clause to something that would permit Leach to end the agreement for any reason, the trial court's interpretation renders the cure provision a practical nullity.
It is not difficult to construct a reductio ad absurdum
scenario from the interpretation that rests Wagoner's right to cure on Leach's discretion. Leach could have claimed, for example, that Wagoner was deficient in not selling ten or twenty times the number of sweepers that any similarly situated dealer had ever sold. Or, the company could have rejected Wagoner's attempts to rectify deficiencies by asserting niggling complaints about matters that had never been broached before. An interpretation that bases all on Leach's discretion renders the protections of the termination provision essentially worthless and one-sided. Under Wisconsin Law, such interpretations must be avoided. See Borchardt v. Wilk (Wis.App. 1990), 156 Wis.2d 420,428, 456 N.W.2d 653, 657 ("In interpreting an ambiguous contract provision, we must reject a construction resulting in unfair or unreasonable results."). We reject the trial court's interpretation, therefore, in favor of one based on a standard of reasonability.
We are further confirmed in our view by the parallels between this case and cases decided under the Wisconsin Fair Dealership Law, Wis.Stat.Ann. 135.01 et sub. Although no party has cited this law to us, it is evident that the termination clause at issue in this case was drawn — nearly word for word — from Section 135.04 of that chapter. Section 135.04 provides, in relevant part:
 Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency. If the deficiency is rectified within 60 days the notice shall be void. * * *.
The termination clause states:
 This Agreement shall continue in force until (1) the Company gives the Distributor ninety (90) days notice of cancellation in writing, stating the reason(s) for termination and shall provide Distributor sixty (60) days in which to rectify any claimed deficiency * * *.
 The points of similarity between the contractual provision and the statute are unmistakable. The reason for the similarity is also clear. At least with regard to dealers located in Wisconsin, any contract that attempts to vary from the requirements of the fair dealership law is void and unenforceable to that extent. Wis.Stat.Ann. 135.025(3). It appears, then, that Leach drafted the clause so that it was consistent with Wisconsin's Fair Dealership Law.
In interpreting Section 135.04, courts have held that the grantor of a dealership must act reasonably in making claims of deficiency and in giving the dealer the opportunity to rectify. See L-O Distribs., Inc. v. Speed Queen Co. (D.C.Minn. 1985),611 F. Supp. 1569, 1579-1580; Al Bishop Agency, Inc. v. Lithonia
(E.D.Wis. 1979), 474 F. Supp. 828, 835. We have reached a similar conclusion in our interpretation of the analogous contract provision.
We recognize that, as a strict matter, Wisconsin's Fair Dealership Law does not apply to the case at bar. The general rule appears to be that resort to Wisconsin law through a contractual choice-of-law clause is insufficient to trigger the protections of the Fair Dealership Law for dealerships located outside of Wisconsin. See Bimel-Walroth Co. v. Raytheon Co. (C.A. 6, 1986), 796 F.2d 840, 842-843. Thus, according to the accepted rule, although out-of-state parties might avail themselves of Wisconsin substantive law, the particular protections of the Fair Dealership Law are unavailable to them.
This rule grew out of a statutory amendment to the law in 1977. Before that amendment, the Sixth Circuit Court of Appeals had held that the law's protections were available to an out-of-state dealer whose contract contained a Wisconsin choice-of-law provision. In Boatland, Inc. v. Brunswick Corp. (C.A. 6, 1977), 558 F.2d 818, the court recognized a Tennessee dealer's rights under the statute against a Wisconsin manufacturer. Probably in response to the Boatland decision, the Wisconsin legislature in 1977 amended the definition of "dealer" to include only businesses "situated in the State of Wisconsin." Wis.Stat.Ann. 135.02; see also Bimel-Walroth, 796 F.2d at 842. Subsequently, courts have interpreted this "situated in" language to exclude dealers outside of the State of Wisconsin, even when they contracted for a Wisconsin choice of law. See Diesel ServiceCo. v. Ambac Intern Corp. (C.A. 7, 1992), 961 F.2d 635, 638, overruled on other grounds by Generac Corp. v. Caterpillar Inc.
(C.A. 7, 1999), 172 F.3d 971; Bimel-Walroth, 796 F.2d at 842.
Even with the added geographical restriction on the Fair Dealership Law's scope, however, we see no reason why dealers outside of the state of Wisconsin should be prevented from contracting so that they have the same protections as dealers located within the state. State laws presumptively operate only upon parties or in regard to events that are located within the borders of the state. In fact, a state's ability to legislate extraterritorially is fairly limited. Nevertheless, when two or more parties contract for a particular choice of state law, they are agreeing to treat each other or the events of their relationship as if they were geographically located within the borders of a particular state. Thus, in each case, the application of any particular state law through contractual choice of law is more a question of the parties' intent than it is a question of legislative intent.
We do not see, therefore, how the Wisconsin legislature could prevent an out-of-state dealer from contracting so that the Fair Dealership Law governs its relationship with a manufacturer. Any attempt by the legislature to provide one set of laws for Wisconsin parties and a different set for parties who choose Wisconsin law through contract invites serious constitutional question. See Lunding v. New York Tax Appeals Tribunal (1998), 522 U.S. —, 118 S.Ct. 766, 774, 139 L.Ed.2d 717, 729 ("The Privileges and Immunities Clause bars discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States."); see also Colgate v. Harvey (1935), 296 U.S. 404,433, 56 S.Ct. 252, 260, 80 L.Ed. 299 ("The right of a citizen in one state to contract in another [is] a privilege protected by the privileges and immunities clause of the Fourteenth Amendment."), overruled on other grounds by Madden v. Kentucky (1940),309 U.S. 83, 60 S.Ct. 406, 84 L.Ed.2d 590. Thus, at best, the rule ofBimel-Walroth suggests to us a default position that permits Wisconsin Manufacturers to avail themselves of the laws of their home state through a simple choice-of-law clause without treating their out-of-state dealers as though they were Wisconsin dealers protected by the Fair Dealership Law. Parties who wish to extend that law's protections to out-of-state dealers, therefore, must specifically contract to treat them as Wisconsin dealers under that law. Alternatively, they may write some or all of the law's provisions directly into their contracts. By adopting the termination procedures of Wis.Stat. 135.04, the parties in this case have chosen this latter route.
As a consequence, we find it appropriate to turn to those cases interpreting Section 135.04 in reaching an understanding of the Leach contract. As we have already noted, those case have recognized a standard of reasonability governing whether a manufacturer may claim a deficiency under the statute and whether it may reject the dealer's attempt at rectification as insufficient before terminating the agreement. See L-O Distribs.,611 F. Supp. at 1579-1580; Al Bishop Agency, 474 F. Supp. at 835. Therefore, we recognize that Leach's ability to terminate this agreement was governed by the same standard.
Having now decided that the termination provision was governed by a standard of objective reasonability, the question remains whether Leach acted reasonably under the contract. There are really two separate questions here: (1) whether Leach acted reasonably in imposing its conditions on Wagoner and (2) whether it reacted reasonably to his remediation attempt. Both of these are questions of fact that would normally belong to the fact-finder. See L-O Distribs., 611 F. Supp. at 1580; Ziegler Co.,Inc. v. Rexnor (1988), 147 Wis.2d 308, 317, 320-21, 433 N.W.2d 8. However, the court may take either question away from the jury if a reasonable person could arrive at only one conclusion in consideration of that question. Frieburg Farm Equip. Inc. v. VanDale (C.A. 7, 1992), 978 F.2d 395.
In regard to the first question, we note that inadequate sales is a valid reason for terminating a dealer under the Fair Dealership Law. Al Bishop Agency, 474 F. Supp. at 834; see alsoL-O Distribs., 611 F. Supp. at 1580. Thus, if Wagoner's sales were inadequate, it would not be unreasonable for Leach to demand that he develop a new marketing plan that would increase his sales. Whether Wagoner's sales were inadequate, however, is a question of fact that is still in dispute. Although failure to meet reasonable sales goals can be deficient performance, the goals must be objectively reasonable. See Frieburg Farm,978 F.2d at 401-402. It is not enough for Leach to claim that Wagoner failed to meet their expectations. Leach's expectations had to be reasonable in light of circumstances and non-discriminatory in comparison to similarly situated dealers. See id.; Al BishopAgency, 474 F. Supp. at 833-834. On the record before us, reasonable people could reach different conclusions as to whether Leach acted reasonably in evaluating Wagoner's sales.
Whether Leach's specific demands regarding a new marketing plan were reasonable depends largely on whether Leach's sales were objectively inadequate. See L-O Distribs., 611 F. Supp. at 1580; AlBishop Agency, 474 F. Supp. at 834. Even assuming that Wagoner's performance was deficient, Leach's individual demands had to be reasonable, essential, and non-discriminatory. See Al BishopAgency, 474 F. Supp. at 834. In particular, Wagoner objected to the requirement that he hire full-time support staff and purchase a demonstration sweeper. On the instant record, we cannot be sure whether these demands were reasonable steps toward increasing sales or, as Wagoner protested at the time, a pretext for termination, designed to be financially impossible for Wagoner to meet. Thus, reasonability here is a question of fact that cannot be determined on summary judgment motion. See Frieburg Farms,978 F.2d at 401.
Leach's repeated demand that Wagoner restore the company's confidence in his sales ability was not an objectively reasonable claim of deficiency. As one court noted under similar factual circumstances:
 [D]efendant's feelings of insecurity cannot form a good cause basis for termination because such feelings are subjective. If a grantor could terminate a dealer on the basis of insecurity, then anytime a grantor wanted to terminate, he could claim insecurity. Such a result would totally negate the prophylactic effect of chapter 135. In the Court's opinion, defendant's feelings of insecurity are not good cause.
 Al Bishop Agency, 474 F. Supp. at 834. We agree with Al Bishop Agency court that subjective feelings of insecurity cannot form the basis of an objectively reasonable claim of deficiency.
We turn then to the second question: whether Leach acted reasonably in regard to Wagoner's attempt to cure. We note that, as an analytical matter, this question is subordinate to the first. A dealer does not need to cure any deficiency that was claimed unreasonably. See id. at 835; cf. Ziegler Co.,147 Wis.2d at 322 ("We hold that when a dealer refuses to substantially comply with the terms of a contract offered by the grantor, the grantor may have good cause to terminate, cancel or fail to renew the relationship at the expiration of the original contract, provided the requirements imposed by the grantor are essential, reasonable and nondiscriminatory.") Thus, although Wagoner manifestly refused to comply with several of Leach's demands, that fact alone did not give Leach the ability to terminate under the contract. To the extent that Leach's claims of deficiency were reasonable, Wagoner had to comply. Then, Leach had to act reasonably in accepting Wagoner's attempts to cure. At each stage, the reasonability of Leach's actions was a question of fact that properly belonged to the jury.
Here, we wish to mark a particular disagreement with the trial court's opinion. The trial court found that Wagoner`s attempt at cure was manifestly insufficient because he only submitted a marketing plan rather than actually rectifying any deficiencies. In Leach's correspondence with Wagoner, however, the company was explicit in requiring Wagoner to make his attempt at rectification through a new marketing plan. For example, in his August 5, 1997 letter Jack Wentz wrote:
 As stated in our original correspondence of July 16, 1997, we will, in accordance with the terms of our sales agreement, accept your detailed marketing plan, responding to our requirements. The plan must be comprehensive. It must address Leach Company's loss of trust and confidence in Midwest Epoke's capability to develop all opportunities.
 It was sufficient, then, for Wagoner to respond to Leach's claims by submitting a revised marketing plan. Contrary to the trial court's finding, Leach did not demand that Wagoner effect that plan immediately.
Furthermore, a demand for rectification is only reasonable if it is possible for the dealer to cure the deficiency within the period allowed. See Al Bishop Agency, 474 F. Supp. at 835. Requiring a dealer to commit himself through a marketing plan may be reasonable even when requiring him take action immediately is not. See, e.g., L-O Distribs., 611 F. Supp. at 1580. To the extent, then, that Leach demanded actions that might take longer than sixty days to perform, it may only have been able to ask Wagoner to respond through a marketing plan.
In consequence of the foregoing, we conclude that questions of fact should have prevented the grant of summary judgment in favor of Leach. Whether Leach breached the agreement with Wagoner by canceling his dealership in violation of the terms of the termination provision remains an open question of fact. Appellant's second assignment of error is sustained.
 IV.
Wagoner's third assignment of error is as follows:
 THE TRIAL COURT ERRED IN GRANTING APPELLEE BEST EQUIPMENT COMPANY SUMMARY JUDGMENT BECAUSE THERE WERE GENUINE ISSUES OF MATERIAL FACT ON BOTH THE CLAIMS OF TORTIOUS INTERFERENCE WITH CONTRACT AND CIVIL CONSPIRACY.
 With this assignment of error, Wagoner addresses two distinct issues. First, he challenges the trial court's determination that Best Equipment was entitled to summary judgment on the claim of tortious interference with a contract. Second he asserts error in the court's resolution of his civil conspiracy claim.
It would have been better form for Wagoner to raise these issues in separate assignments of error. See App.R. 16(A)(3); see also Taylor v. Franklin Blvd. Nursing Home, Inc. (1996), 112 Ohio App.3d 27,32 ("Assignments of error should designate specific rulings which the appellant wishes to challenge on appeal.") This is particularly so because Wagoner fails to assign error in regard to the trial court's determination of his civil conspiracy claim against Leach. Nevertheless, Wagoner clearly wishes to revive his civil conspiracy claim in regard to both defendants as he raises the question properly in his statement of issues presented for review. We have discretion to consider briefs out of conformity with the appellate rules. See App.R. 3(A); Hutchins v. DelcoChassis Systems, GMC (Feb 20, 1998), Montgomery App. 16659, unreported, at 4. Accordingly, in the exercise of that discretion, we will consider both questions as though they were raised separately.
Because both causes of action sound in tort rather than contract, the contractual choice of Wisconsin law does not govern these claims. Ohio substantive law governs because the defendants' actions and the claimed harm to the plaintiff all occurred within Ohio. See 16 Ohio Jurisprudence 3d (1979), 93, Conflict of Laws, Section 42.
A. Tortious Interference with a Contractual Relationship
The Supreme Court of Ohio first recognized an action for tortious interference with a contractual relationship in Kenty v.Transamerica Premium Ins. Co. (1995), 72 Ohio St.3d 415, paragraph one of the syllabus. In that opinion, the Court adopted the approach of the Restatement of the Law 2d, Torts (1979), Section 766, which states:
 One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.
 Id. at 418-419. The Court recognized five elements that a plaintiff must prove to show tortious interference; they are: "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." Id. at paragraph two of the syllabus.
When the defendant charged with tortious interference is a business competitor, a number of Ohio courts have turned to Section 768 of the Restatement. E.g., Brookeside Ambulance, Inc.v. Walker Ambulance Serv. (1996), 112 Ohio App.3d 150, 157; Hoyt,Inc. v. Gordon Assoc., Inc. (1995), 104 Ohio App.3d 598, 611;Walter v. Murphy (1988), 61 Ohio App.3d 553, 556. That section provides special justification for contractual interference, in the interest of promoting business competition. It states:
 (1) One who intentionally causes a third person not to enter a prospective contractual relation with another who is his competitor or not to continue an existing contract terminable at will does not interfere improperly with the other's relation if
(a) the relation concerns a matter involved in the competition between the actor and the other and
(b) the actor does not employ wrongful means and
(c) his action does not create or continue an unlawful restraint of trade and
(d) his purpose is at least in part to advance his interest in competing with the other.
(2) The fact that one is a competitor of another for the business of a third person does not prevent his causing a breach of an existing contract with the other from being an improper interference if the contract is not terminable at will.
 4 Restatement of the Law 2d, Torts (1979) 39, Section 768. Best argues that its actions were privileged actions of a business competitor under this section.
In granting Best's summary judgment motion, the trial court found that Wagoner had failed to prove the third and fourth elements of his claim: Best's intentional procurement of the contract's breach and lack of justification. The court held that Leach did not breach its contract with Wagoner. Instead, the court held, Leach canceled a contract that was terminable at will. Accordingly, the court reasoned that Best did not procure any breach of contract. In addition, because the contract was terminable at will, the trial court agreed with Best that its actions were privileged under Section 768 of the Restatement.
We have already determined, however, that the agreement between Leach and Wagoner was not terminable at will. Leach was only able to terminate the contract after it found deficiencies and gave Wagoner the opportunity to cure them. We have also found that there exists a material question of fact in regard to whether Leach breached its contract with Wagoner. Therefore, we disagree with the trial court's reasoning that Wagoner could not prove tortious interference because he could not prove breach of contract.
In addition, we find the defense available under Section 768 inapplicable. Certainly, we agree with the trial court that Best was a business competitor of Wagoner and Midwest Epoke. Nevertheless, subsection two of Section 768 states that interference causing the breach of an existing contract may still be improper if the contract is not terminable at will. Because, as we have noted, the contract was not terminable at will, Best's status as a business competitor cannot protect it from liability if it intentionally procured a breach.
Having found error in the trial court's reasoning, we will review each element afresh to see if Wagoner's claim against Best could withstand a summary judgment motion. We have already found that Best's alleged interference was not justified by its business-competitor status. Since Best has asserted no other justification, we see the fourth element as met for the purposes of summary judgment.
There is no serious dispute over proof of the first element, the existence of a contract between Leach and Best. Regarding the second element, knowledge of the contract, Best clearly knew that Leach had a contract with Wagoner. Michael T. Dahlmann, president of Best, testified in his deposition that he not only knew of the contract, but he was aware of its terms because he had a nearly identical contract with Leach. There is no serious dispute, furthermore, that Wagoner suffered some business losses from the termination of the agreement. Thus, there is sufficient evidence in regard to the fifth element.
Here, the third element presents the greatest difficulty. We have already noted that the question of whether Leach breached its contract remains an open question for the fact-finder. Nevertheless, in order to survive summary judgment on this third element, Wagoner had to put forward some evidence that Best intentionally caused Leach to breach its contract. It is not sufficient for Wagoner to show that Best wanted Leach to cancel its contract, because Leach was capable, under the right circumstances, of canceling its contract without breaching. Most of the evidence of regarding Best's tough competitive practices only shows that it wanted Leach to cancel its contract with Wagoner.
Dahlmann's February 18, 1997 letter to Leach, however, is competent evidence that would support a reasonable inference that Best wanted Leach not only to cancel the contract, but to breach it. The letter stated, in relevant part:
 My concern, Jack [i.e. Leach sales manager, Jack Wentz], is that if a change is inevitable, what are we waiting for except to avoid the unpleasantness of the cancellation process?
We are eager to get our teeth into this new territory. It appears that [Leach's competitors] Johnson and Sun Vac are running wild.
As grateful as we would be to be the new dealer, to get the line in mid to late summer would mean we would effectively lose "a season" and all the opportunities it offers. Our E10 demo should be ready by mid-April.
With much empathy, I understand a dealer can miss a deal once in a while. However, this appears to be a trend with the present dealer. We have proven in Indiana that an aggressive demo program results in sales.
 This letter, like others in the record, shows a clear desire for Best to replace Wagoner as the authorized Leach dealer in Southwest Ohio. Yet, this letter also suggests more. As an authorized Leach dealer in Indiana, Best was aware that Leach dealers had to be given ninety days notice before termination, and at least sixty days to cure any claim of deficiency. Nevertheless, Dahlmann appears to be asking Leach to replace Wagoner as early as mid April. At the earliest, assuming Wagoner received ninety days notice on February 19, Leach could not terminate Wagoner until May 21. Moreover, the delay might well be longer, or Leach might be unable to replace Wagoner if he was able to remedy the claims of deficiency. A reasonable juror might conclude from this that Best wanted Leach to circumvent the provisions of the termination clause in its distributorship contract and terminate Wagoner immediately. That conclusion might also arise from Dahlmann's statement: "what are we waiting for except to avoid the unpleasantness of the cancellation process." A reasonable juror, again, might infer from this statement that Best wanted Leach to terminate its agreement now, regardless of the consequences.
We do not intend to say that these conclusions are inevitable. Different jurors might interpret the letter differently. Nevertheless, we think this evidence sufficient to prevent summary judgment on the question of whether Best intentionally procured a breach. Accordingly, because there is some evidence to support each element of Wagoner's claim for tortious interference, we sustain, in part, his third assignment of error.
 B. Civil Conspiracy
The Supreme Court of Ohio has defined "civil conspiracy" as "a malicious combination of two or more persons to injure another in person or property, in a way not competent for one alone, resulting in actual damages." Kenty v. Transamerica Premium Ins.Co. (1995), 72 Ohio St.3d 415, 419; LeFort v. Century 21-MaitlandRealty Co. (1987), 32 Ohio St.3d 121, 126. The following have been articulated as the elements a civil conspiracy claim: (1) a malicious combination, (2) involving two or more persons, (3) causing injury to person or property; and (4) the existence of an unlawful act independent from the conspiracy itself. UniversalCoach, Inc. v. New York City Transit Auth., Inc. (1993), 90 Ohio App.3d 284,292.
Certainly, Wagoner met the requirements of summary judgment in showing the first two elements of this claim. He put forward some evidence that Leach and Best — two persons — acted in concert. The malice required by the first element, moreover, is only "that state of mind under which a person does a wrongful act purposely, without a reasonable or lawful excuse, to the injury of another."Williams v. Aetna Fin. Co., (1998), 83 Ohio St.3d 464, 475, citingPickle v. Swinehart (1960), 170 Ohio St. 441, 443; Gosden v. Louis
(1996), 116 Ohio App.3d 195, 219. Malice, therefore, need not be proven expressly or separately from the other elements of the tort. Gosden, 116 Ohio App.3d 219-220.
Wagoner also survives summary judgment on the third element. No party has seriously disputed that Wagoner suffered some business losses from the termination of his agreement. If the termination was the result of a conspiracy, then Wagoner's damages surely arose as a consequence of that conspiracy.
The most difficult question, then, involves the fourth and final element: the existence of a separate unlawful act underlying the claim of conspiracy. The trial court granted summary judgment to both Leach and Best because it found no evidence of an underlying wrong. The trial court had already rejected Wagoner's claims for breach of contract and tortious interference. As a consequence, the trial court found no underlying action on which Wagoner could rest his claim of civil conspiracy. Because we have found that material questions of fact prevented summary judgment on both claims, we must reject the trial court's reasoning here.
Nevertheless, a difficult issue remains as to whether an illegal act occurred that could underlie the civil conspiracy tort. The illegal act required for civil conspiracy must be something that, without the conspiracy, would still give a cause of action against one or more of the defendants. Gosden v. Louis
(1996), 116 Ohio App.3d 195, 221. As the trial court recognized, Wagoner has stated two potential causes of action against Leach and Best, other than civil conspiracy: breach of contract and tortious interference. We conclude that neither of these acts could form a predicate for Wagoner's civil conspiracy claim.
A cause of action may exist for conspiracy to tortiously interfere with a contractual relationship. 16 American Jurisprudence 2d (1998) 285, Conspiracy, Section 61. The claim, however, must involve two or more nonparties conspiring to induce a party to breach his contract. Id. It makes no sense to say that a party conspired to induce himself to breach a contract. Because Wagoner's claim involved a party to the contract and only one nonparty, his civil conspiracy cannot rest on the allegation of tortious interference.
As to the question of whether a claim of civil conspiracy can rest on breach of contract alone, there is a distinct split of authority. Courts in other states have reached diametrically opposite conclusions. See id.; Annotation, Liability for Procuring Breach of Contract (1952), 26 A.L.R.2d 1227, 1284; A.L.R.2d Later Case Service (1996), 276-280. Also compare Barberv. Stephenson (1953), 260 Ala. 151, 69 So.2d 251 (recognizing no claim), with Rosen v. Alside, Inc. (Mo. 1952), 248 S.W.2d 638
(recognizing a claim).
There is no authority directly on point from the Ohio Supreme Court. Our appellate district, however, has considered the question directly, and we have held that a party cannot be held liable for conspiring to breach his own contract. Schell v.Kaiser-Frazer Sales Corp. (1971), 28 Ohio App.2d 16, 21-22. Nothing in the present case gives us cause to reconsider our decision in Schell. Thus, Wagoner's civil conspiracy claim must fail.
We continue to believe, moreover, that the rule we adopted inSchell is fundamentally correct. As the New York Court of Appeals remarked, the opposing rule that recognizes a claim for conspiracy to breach a contract permits a plaintiff to "restate as a conspiracy that which amounts to nothing more than * * * breach of contract." Miller v. Vanderlip (1941), 285 N.Y. 116, 33 N.E.2d 51,56. So doing, the plaintiff is able to metamorphose a contract claim into a tort, complete with the opportunity to seek punitive damages. Because the essence of the plaintiff's claim remains the breach of contract, he should not be able to pursue punitive damages. See Schell, 28 Ohio App.2d at 22.
Furthermore, the claim of conspiracy to breach a contract, by allowing a plaintiff seeking damages for breach of contract to demand tort damages (including possibly punitive damages), undermines the efficiency and stability of an economic system based on contract, as the California Supreme Court has recognized. See Applied Equip. v. Litton Saudi Arabia (1994), 7 Cal.4th 503,520, 28 Cal.Rptr. 475, 484. The system of contract law, by confining damages to the each party's expectation interest, permits each party to make a rational choice to breach his contract if economic efficiency so demands, so long as he fully compensates the other contracting party. If, however, the potential for tort liability exists:
 the potential consequences of any breach of contract — efficient or inefficient, socially desirable or undesirable — become uncertain and unpredictable. Tort liability may or may not follow, depending on a myriad of imponderable factors. As a result, a business fearful of unfathomable tort exposure might lose the ability to respond flexibly to changing economic conditions or hesitate to enter into contracts at all in fast-moving aspects of commercial enterprise.
 Id.
With regard to any non-contracting conspirators, moreover, the claim is entirely superfluous to the tort of contractual interference. Indeed, because it is virtually impossible to induce a breach of contract without communicating with the contracting party, "any and every induced breach [would create] a potentially triable conspiracy case." Id. Conspiracy, then, would simply become a means of circumventing the well-established rule that "a party cannot be sued in tort for interfering with its own performance." Contadino v. Tilow (1990), 68 Ohio App.3d 463,469.
A number of Ohio courts have referred to the underlying illegal act in a civil conspiracy claim as being a tort. Gosden,116 Ohio App.3d at 220; Stiles v. Chrysler Motors Corp. (1993),89 Ohio App.3d 256, 266; Crosby v. Beam (1992), 83 Ohio App.3d 501,515. As our court held in Schell, the cause of action underlying a claim of civil conspiracy must sound in tort. See Schell,28 Ohio App. 2 at 22. Because Wagoner failed to state such a claim for civil conspiracy against either Leach or Best, the trial court did not err in granting summary judgment to the defendants on that claim. To this extent, appellant's third assignment of error is overruled.
 V.
In accordance with the foregoing, we reverse the judgment of the trial court on Wagoner's claim against Leach for breach of contract. Material issues of fact remain regarding whether Leach breached the termination provision of its contact with Wagoner under Wisconsin law. We also reverse the trial court's judgment on Wagoner's claim of tortious interference against Best. Some competent evidence exists showing that Best may have procured a breach of contract. Thus, summary judgment was inappropriate. Finally, we affirm that portion of the trial court's judgment that decided Wagoner's claim of civil conspiracy in favor of the defendants.
Judgment affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.
FAIN, J., and YOUNG, J., concur.
Copies mailed to:
Don A. Little
Jonathan Hollingsworth
Elizabeth L. Ross
Mark E. Lutz
Michael S. Roe
Hon. Adele Riley